**Mari O. HUNTER, Individually and as Trustee of the Anne Klimowicz Irrevocable Trust, Appellant–Defendant,**

v.

**Anne KLIMOWICZ, Appellee–Plaintiff.**

No. 45A03–0606–CV–263.

Court of Appeals of Indiana.

June 5, 2007.

Patrick B. McEuen, Millbranth & Bush, Valparaiso, IN, Attorney for Appellant.

Margo R. Babineaux, Meinzer & Babineaux, St. John, IN, Attorney for Appellee.

## OPINION

BAKER, Chief Judge.

Appellant-defendant Mari O. Hunter, individually and as trustee of the Anne Klimowicz Irrevocable Trust (the Trust), appeals from the trial court's order rescinding the Trust. Hunter raises a number of arguments regarding the rescission of the Trust, focusing on allegations of undue influence and capacity. Finding that Anne lacked proper capacity to create the Trust, we affirm the judgment of the trial court.

### FACTS

Anne is an elderly widow with two adult children, Hunter and Alfred J. Klimowicz. In February 2000, Anne executed a will in which she left her entire estate to Alfred and explicitly disinherited Hunter.

On August 3, 2000, Anne suffered an acute stroke for which she was hospitalized and later transferred to the hospital's rehabilitation unit. Anne spent nearly a month in the hospital before she was released. Her attending physician, Dr. Mark Alan Simaga, testified that although Anne became more alert and cooperative during her rehabilitation, she was still struggling with understanding written and spoken language in December 2000. Dr. Simaga attested that based on Anne's neurological condition and the medications she was taking, she was unable to appreciate and understand a complicated legal document at that time.

When Anne moved home from the hospital, Hunter and Hunter's husband and son moved in with Anne to care for and assist in her recovery. While Hunter was living in Anne's home, she discovered Anne's will, which provided for Hunter's disinheritance. Hunter became upset and angry upon realizing that she had been disinherited and told Anne that she would not take

care of her "for nothing." Tr. p. 44, 48. Subsequently, Hunter arranged for several meetings between Anne and an attorney. Following those meetings, Anne appointed Hunter to be her attorney in fact and also to be her attorney in fact for healthcare purposes. On December 5, 2000, Anne also executed the Trust, which appointed Hunter as trustee and left the home and the bulk of Anne's estate to Hunter. The attorney recorded the meeting regarding the trust, and the following exchange occurred:

> Attorney: ... [Y]ou have specifically stated that this trust is irrevocable.
>
> Anne: Uh-huh.
>
> Attorney: Do you know what that means?
>
> Anne: It cannot be changed.
>
> Attorney: Exactly. This trust can never be changed.
>
> Anne: Uh-huh.
>
> Attorney: You're giving up all rights to alter this, to amend it, to revoke it, to terminate it. You're giving that all up. You can never change this trust.
>
> Anne: Okay.
>
> Attorney: Do you understand that?
>
> Anne: I understand.

Appellants' App. p. 125.

On September 15, 2003, Anne filed a complaint against Hunter, individually and as trustee of the Trust, seeking to have the Trust rescinded because of duress, undue influence, and lack of capacity. A bench trial was held on August 8, 2005, before the Honorable James Danikolas. Pursuant to the judge's request, the parties submitted proposed findings of fact and conclusions of law. Before Judge Danikolas could rule on and enter an order in this matter, however, he passed away. Rather than retrying the case, the parties agreed that Temporary Judge Webber would rule on the case based solely on the transcripts and evidence presented at the trial. On January 31, 2006, Judge Webber ruled in favor of Anne in all respects, concluding that at the time of the creation of the Trust, Anne did not have capacity to enter into a complicated legal document and that she was unduly influenced by Hunter. The trial court ordered that the Trust be rescinded and that the real estate that was placed into the Trust be conveyed back to Anne.[1] Hunter now appeals.

## DISCUSSION AND DECISION

Initially, the parties disagree about the standard of review to be applied to the trial court's order. Anne argues that we should apply a clearly erroneous standard of review because the trial court provided findings of fact and conclusions of law and because the parties' agreement to forego a second trial cloaked the temporary judge with all of the jurisdiction and authority that originally resided in Judge Danikolas. Hunter, on the other hand, insists that we should review the judgment de novo because the temporary judge ruled solely based on the documentary transcripts and evidence presented at trial.

We agree with Hunter. Because we are reviewing the same information that was available to the trial court, we need not defer to its findings. *See Title Servs., LLC v. Womacks,* 848 N.E.2d 1151, 1154 (Ind.Ct.App.2006) (applying de novo standard of review where trial court ruled based on a paper record because the reviewing court is in as good a position as

---

**1.** The trial court also ruled in favor of Anne regarding a vehicle she had sold to Hunter for $1,700. Hunter had failed to pay any portion of the $1,700, and the trial court ordered her to do so together with interest and court costs. Hunter does not appeal that portion of the trial court's order.

the trial court to evaluate the evidence and make decisions based thereon). Consequently, we will apply a de novo standard of review to the trial court's decision herein.

Indiana Code section 30–4–2–10(c) provides that to create an irrevocable trust, the settlor must "be of sound mind and have a reasonable understanding of the nature and effect of the act and the terms of the trust." If we determine, therefore, that Anne did not meet these requirements at the time she executed the Trust, then it is void and rescindable, inasmuch as its creation did not comply with the statute.

In Dr. Simaga's deposition, he attested as follows regarding Anne's capacity following the stroke:

A. [S]he was still having trouble with some of her activities of daily living. She had trouble with her speech so communications would have been difficult. . . .

\* \* \*

Q. And with regards to the records of [Anne] did she have any loss of alertness or . . .

A. It was, it was minimal at that point. For the first couple of days during her hospitalization she was still—she had a lot of trouble with language, she still had trouble with, with expressive speech, some receptive speech and then with the right-sided weakness. [After she moved into the rehabilitation unit, she] improved markedly, she was much more alert, much more interactive, able to speak, able to cooperate with her therapist during that stay.

\* \* \*

Q. Okay. Specifically on December 5th, 2000 she entered into an irrevocable trust agreement. Did she have the mental capacity . . . to enter into any financial arrangement . . . ?

A. I would be—I think any, any complicated arrangement that she would get into would be suspect, in my opinion, and the reason is that she would have difficulty with understanding which was one of the problems she had all during her, her recovery. She had trouble understanding language and whether it was written language or spoken language she would have difficulty understanding that. And whether she could comprehend a complicated legal document could be debated, but I don't think that she could fully understand it, not given what I saw at that time. With regard to her overall mental status could she have understood, could she have written a check or could she have made a decision about where to go for dinner? Yes, she could have done that.

Q. So as I understand then basic, simple decisions she could make, but when it became a complex decision or a complex solution to a problem she would have difficulty then?

A. Absolutely.

\* \* \*

Q. With the understanding that this trust agreement was written approximately a hundred and twenty days after her stroke, that time period there, would that have been a sufficient time from the date of the stroke for her to fully recover?

A. No.

\* \* \*

Q. During the first, say, six months of her treatment with you was she under any medication . . . that would affect her cognitive ability to function at least mentally, her mental capacity?

A. Yes.... She was—at that time she was taking Xanax and Neurontin and both of those can have, can have cognitive effects.

Q. What would be the effect of Xanax?

A. It's, it can be sedating and it also affects memory function so memory is poor just from medication.

\* \* \*

Q.... The combination of these two drugs though, I mean, combined with her stroke, would this affect her ability to be influenced by others in more than a normal pattern?

A. Yes.

Appellant's App. p. 140–47.

We are persuaded that this testimony from Anne's treating physician establishes that she was not of sound mind and did not have a reasonable understanding of the nature and effect of the act and the terms of the Trust at the time of its creation. Although Anne's statements recorded at the time of the Trust could be viewed as evidence of her mental capacity, we find them to be ambiguous and note that, at a later date, she could not recall the meeting at all and was perplexed when shown the documents bearing her signature. *Id.* at 25–28. Under these circumstances, we conclude that the trial court properly ordered that the Trust be rescinded.[2]

The judgment of the trial court is affirmed.

DARDEN, J., concurs.

ROBB, J., concurs in result with opinion.

ROBB, Judge, concurring in result.

I concur in the result reached by the majority, but write separately to emphasize an important distinction between this case and the typical estate case regarding testamentary capacity.

In general, we presume that every person is of sound mind to execute a will. In order to rebut that presumption, the party asserting unsound mind must show that the testator lacked capacity at the time of executing the document to know 1) the extent and value of his property; 2) those who are the natural objects of his bounty; and 3) their desserts, with respect to their treatment and conduct toward him. *Gast v. Hall,* 858 N.E.2d 154, 164 (Ind.Ct.App. 2006). Pursuant to statute, the same test applies to the capacity to create, amend, or revoke a revocable trust. Ind.Code § 30–4–2–10(b). However, this is not the test for an irrevocable trust such as Anne created here. As the majority notes, in the case of an irrevocable trust, Indiana Code section 30–4–2–10(c) provides that the settlor "must be of sound mind and have a reasonable understanding of the nature and effect of the act and the terms of the trust." This is an important distinction, because I believe Dr. Simaga's testimony would not have supported a conclusion that Anne did not know the extent and value of her property, the natural objects of her bounty, and their desserts. But because, with respect to an irrevocable trust, Anne must have understood the nature and effect of her act and the terms of the trust, I agree with the majority that Dr. Simaga's testimony that Anne could not comprehend a complicated legal document supports the trial court's order rescinding the Trust.

---

**2.** Given that we conclude that Anne lacked the capacity to create the Trust, we need not consider her claim that she was unduly influenced by Hunter to execute the document.